*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0359P (6th Cir.)
File Name: 01a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ROBERT MITZEL,
      *Petitioner-Appellant,*

    *v.*

ARTHUR TATE, Warden,
      *Respondent-Appellee.*

No. 99-3992

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 96-02322—Peter C. Economus, District Judge.

Argued: June 8, 2001

Decided and Filed: October 5, 2001

Before: KEITH, BATCHELDER, and MOORE, Circuit
Judges.

———————————

## COUNSEL

**ARGUED:** Thomas R. Wetterer, Jr., PUBLIC
DEFENDER'S OFFICE, Columbus, Ohio, for Appellant.
Stuart W. Harris, OFFICE OF THE ATTORNEY
GENERAL, CORRECTIONS LITIGATION SECTION,
Columbus, Ohio, for Appellee. **ON BRIEF:** Thomas R.
Wetterer, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio,
for Appellant. Stuart W. Harris, OFFICE OF THE

1

ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Petitioner-Appellant Robert Mitzel ("Mitzel" or "petitioner") appeals the district court's denial of his petition for a writ of habeas corpus.  We granted a certificate of appealability ("COA") with respect to three issues:

1) whether the trial court improperly admitted into evidence statements made by Mitzel to police;

2) whether the trial court improperly failed to give a jury instruction on aiding and abetting a suicide; and

3) whether Mitzel's trial counsel rendered ineffective assistance by not requesting a jury instruction on aiding and abetting suicide.

We now **AFFIRM** the district court's decision denying Mitzel habeas corpus relief with respect to all three issues.

### I.  BACKGROUND

On the evening of January 12, 1987, the Niles, Ohio Police Department received several telephone calls from a concerned Robert Mitzel.  Over the course of Mitzel's phone conversations with the Niles Police, Mitzel informed them that he was worried that his friend, Randy Ralston, had committed suicide earlier that day.  Although the facts relayed by Mitzel over the telephone were, at times, inconsistent, he did gradually reveal over the course of his four telephone conversations with the police that he had been with Ralston earlier that day; that Ralston had talked about committing suicide throughout the day; and that Mitzel had dropped Ralston off behind the "old King's Market" earlier that

365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690). With respect to the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

As stated in Part II.C of our opinion, Mitzel has failed to provide us with any basis upon which to overcome the state court's finding that there was insufficient evidence to support an aiding and abetting jury instruction in this case. In light of this, we cannot conclude, particularly in light of the "highly deferential" scrutiny of counsel's performance that *Strickland* requires, that Mitzel's attorney's failure to request such an instruction constituted an error so serious that he "was not functioning as the 'counsel' guaranteed [Mitzel] by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 689. Accordingly, Mitzel is unable to establish an ineffective assistance of counsel claim with respect to his attorney's failure to request a jury instruction on aiding and abetting suicide.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM**, in all respects, the district court's decision denying Mitzel's petition for a writ of habeas corpus.

afternoon. Trial Transcript ("Tr.") at 41 (Officer Wilson Direct Exam.). Mitzel informed the police that Ralston had mentioned using either a .22-caliber rifle or sleeping pills to commit suicide, and that Ralston had even asked Mitzel to help him commit suicide earlier that morning while in class at the vocational school they both attended.[1]

Based on the information given by Mitzel, the Niles Police dispatched two officers to King's Market at approximately 9:00 p.m. The officers noticed tire tracks and two sets of footprints leading into the woods behind the market. The officers could find, however, only one set of footprints leading out of the woods. A short distance into the woods, the officers found Randy Ralston's body. Ralston had suffered two gunshot wounds to the head, and had no pulse. Near Ralston's body, the officers discovered five spent .22-caliber shotgun shells.

Captain Robert Jacola, called in to assist with evidence gathering at the crime scene, spoke with Mitzel after Jacola arrived back at the police department. Mitzel had come to the police department of his own volition. Before speaking with Mitzel, Jacola read Mitzel a "rights waiver" form and had Mitzel initial each line after Jacola explained it to him. Mitzel also signed the waiver form after Jacola verbally explained the form to him. Officer Wilson of the Niles Police Department witnessed this process.

In this first statement to the police, Mitzel told Jacola that, on the morning of January 12, 1987, Ralston had asked Mitzel to kill someone for Ralston. Mitzel stated that it was not until later that morning that he realized that this "someone" was Ralston, himself.[2] Mitzel told the officers that, sometime in

---

[1] Mitzel was eighteen years old at the time of this incident. Ralston was seventeen years old.

[2] Evidence presented at trial showed that Ralston had been planning a suicide. A suicide note in Ralston's handwriting to be given to Ralston's ex-girlfriend was admitted into evidence. In addition, Ralston

the afternoon or early evening on January 12, he dropped Ralston off behind King's Market. According to Mitzel, this was the last time he had seen Ralston. Jacola checked with the police dispatcher to determine if Mitzel's calls to the station earlier that evening were consistent with Mitzel's statement to him.

Upon returning to the interrogation room, Jacola asked Mitzel to tell him the story again. At this point, Mitzel revealed more details and eventually drafted a written statement to Captain Jacola after signing another rights waiver form. In this written statement, Mitzel admitted to accompanying Ralston into the woods behind King's Market. Mitzel further stated that Ralston asked Mitzel to shoot him once they were in the woods, but Mitzel declined. At this point, according to Mitzel's statement, Ralston grabbed the .22-caliber rifle that Mitzel was holding, put it to his own head, and shot himself. Despite the fact that Ralston had shot himself in the head, Mitzel told the police that Ralston remained conscious and able to communicate with Mitzel. Mitzel allegedly asked Ralston if he wanted Mitzel to call an ambulance. Ralston told Mitzel he did not want an ambulance, and instead asked Mitzel to shoot Ralston until he was dead. According to Mitzel's statement, Mitzel then shot Ralston in the head, killing him. Mitzel then went home and called the police.

After Mitzel drafted his own statement, Captain Jacola typed, word for word, another, more detailed, statement given by Mitzel. In this typed statement, in addition to the details given in Mitzel's hand-written statement, Mitzel admitted to going to his house after school on the day of the incident with Ralston to pick up Mitzel's .22-caliber rifle.[3] Mitzel further

---

had taken a large number of what he apparently thought to be sleeping pills from his grandmother when he visited her on the day of the incident to borrow money to buy food. In actuality, however, the pills were only laxatives.

[3] The .22-caliber rifle was later found at Mitzel's house.

In light of the facts detailed by the state court of appeals; Mitzel's open avowal on the witness stand that he, alone, shot Ralston a second time while Ralston was still alive; and the pathologist's testimony that it was *both* bullet wounds that caused Ralston's death; we cannot state that the state court of appeals's decision that the evidence did not support an aiding and abetting suicide instruction "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Accordingly, we **AFFIRM** the district court's denial of Mitzel's habeas petition with respect to this claim.

### D. Was Mitzel Deprived of Constitutionally Effective Assistance of Counsel By His Attorney's Failure to Request a Jury Instruction Relating to Aiding and Abetting a Suicide?

The final issue for which we granted petitioner a COA is whether Mitzel received constitutionally inadequate assistance of counsel due to his attorney's failure to request a jury instruction on aiding and abetting suicide. The standard for ineffective assistance of counsel is provided by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

In judging the performance prong of the *Strickland* test, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S.

state court of appeals concluded that "[t]hese actions were tantamount to separate, distinct, active participation beyond that of 'aiding and abetting[,]'" and that "[t]his evidence was so overwhelming so as to indicate active participation and preclude [an aiding and abetting suicide instruction]." *Id.*[4]

The state court of appeals based its decision that an aiding and abetting suicide instruction was improper in this case on state law and factual determinations derived from the trial record. On habeas review, the state court of appeals's findings of fact must be presumed correct, and can only be discredited if the petitioner can show, by clear and convincing evidence, that the state court's findings were erroneous. 28 U.S.C. § 2254(e)(1). Mitzel has not brought forth any such evidence. Rather, in support of his contention of error, Mitzel cites to *Mathews v. United States*, 485 U.S. 58, 63 (1988), in which the Supreme Court noted that, "[a]s a general proposition[,] a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." (Relying on *Stevenson v. United States*, 163 U.S. 313 (1896)). As the district court noted, however, *Mathews* does not control if we are given no basis upon which to overcome the state court's factual findings that there was *not* sufficient evidence to support the defendant's theory of aiding and abetting suicide.

---

[4]While the Supreme Court of Ohio has not addressed what differentiates assisted (or aiding and abetting) suicide from murder, those state courts that have addressed similar situations to this one have come to the same conclusion as the state court of appeals in *Mitzel. See, e.g., People v. Matlock*, 51 Cal. 2d 682, 694 (1959) (noting that a California statute holding the assistance of suicide to be a felony, but not murder, '"contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death, . . . for the use of the person who himself commits the act of self-murder. But where a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, . . . his act constitutes murder[.]'" (Quoting *State v. Bouse*, 264 P.2d 800, 812 (Or. 1953)).

stated that the two went to K-Mart to purchase shotgun shells for the rifle. Mitzel read and signed the statement after Jacola had finished typing it.

After Mitzel signed the typed statement, Captain Jacola asked him to videotape a statement. Mitzel agreed, signing another rights waiver form. In the videotaped statement, Mitzel further admitted that, when in the woods, he had initially loaded, cocked, and aimed the rifle at Ralston, but was unable to pull the trigger. Because he was unable to pull the trigger himself, Mitzel then demonstrated to the police how he held the stock of the gun for Ralston as Ralston pulled the trigger, thereby inflicting the first gunshot wound.

Following the videotaped statement, Mitzel agreed to an atomic absorption test, a test used to determine if one has recently discharged a firearm. The test results showed that the traces of barium and antimony on Mitzel's hands were not sufficiently large to be consistent with Mitzel having used a firearm. An atomic absorption test performed on Ralston, however, did show barium and antimony traces consistent with gunshot residue. According to Mitzel's own testimony at trial, Mitzel had taken a shower after the shooting and before going to the police department.

Mitzel's statements did not conclude until after midnight on January 13, 1987, and the police held Mitzel in jail until the next morning, at which time he made his initial appearance before a judge. Prior to the initial appearance, Mitzel's father hired an attorney to represent Mitzel, and the attorney did accompany Mitzel to the proceeding. Thereafter, the police asked Mitzel and his attorney if Mitzel would be willing to take a polygraph test. Mitzel's attorney at the time, Fred Snyder, gave the police permission to administer the test that day, but told Officer Tedesco of the Niles Police Department that Snyder would be unable to witness the examination because he had another matter to attend to.

After the test was administered, Niles police officers informed Mitzel before escorting him back to his jail cell that the test results indicated that Mitzel had not told "the whole

truth." Supp. Hr'g at 63. Mitzel then told the officers that he wanted to tell them the whole truth. The officers informed him that he had the right to have his attorney present during questioning, but the defendant allegedly stated that he did not need his attorney present. Mitzel also signed another rights waiver form. Whereas Mitzel originally told police that Ralston took the gun from Mitzel and alone inflicted the first shot, in this post-polygraph statement, Mitzel explained that Ralston was unable to pull the trigger himself, and Ralston asked Mitzel for help. According to this statement, Ralston asked Mitzel to help pull Ralston's thumb, which was on the trigger. Mitzel then stated that he did help pull on Ralston's thumb, at which point the gun fired. Tr. at 121-22 (Officer Tedesco Cross-Exam.). This was the last of Mitzel's statements to the police.

Prior to trial, Mitzel moved to suppress all of the statements he made to the Niles Police. Following a suppression hearing, the state trial judge denied, in all respects, Mitzel's motion to suppress. At trial, all of Mitzel's statements were admitted into evidence. Apart from Mitzel's statements to the police, the primary evidence presented by the State was that of the pathologist who performed Ralston's autopsy. The pathologist testified that both bullet wounds were the main cause of Ralston's death. The pathologist could not state conclusively whether death would have occurred had not both shots been fired.

The defense called only two witnesses: Robert Mitzel, and his father, William. On the stand, Robert Mitzel admitted to shooting Ralston in the head, despite the fact that Ralston was still conscious and talking to Mitzel. Mitzel testified that Ralston had inflicted the first gunshot wound, and that Mitzel inflicted the second wound only after Ralston asked Mitzel to shoot Ralston until he was dead.

On July 7, 1987, the jury found the defendant guilty of murder and an accompanying firearm specification. The trial judge sentenced Mitzel to a definite term of three years for the

(Emphasis added).

The state court of appeals explicitly addressed the issue of the propriety of an aiding and abetting suicide instruction on direct appeal. The court first "noted that the decision to issue instructions rests within the sound discretion of the court." *Mitzel*, 1989 WL 110827, at *7. The court then explained that there is no way the trial court could have erred with respect to its omission of an aiding and abetting suicide instruction if there was insufficient evidence at trial to support such a defense. Before turning to the evidence presented at trial to make this determination, the state court of appeals first looked to the state law of aiding and abetting.

Under Ohio law, the court determined that there was a fundamental difference between one who "help[s], assist[s], or strengthen[s]" a principal in achieving a particular end, and one who "actively participate[s]" in the conduct at issue. *Id*. at *8 (quotation omitted). The court noted that when one's conduct goes beyond "help[ing], assist[ing], or strengthen[ing]" another toward accomplishing some end, that person's "status alters from that of an aider and abettor to that of an active participant or co-principal." *Id*. (quotation omitted).

With this state law in mind, the court then turned to the facts of the case. The court stated that, at least with respect to the second shot fired solely by Mitzel, his actions had transformed him from an aider and abettor to that of an active participant. The court explained that the facts of the case showed that Mitzel's firing the second shot at Ralston was "not a continuation of the initial act, but constituted an occurrence separate and apart from the firing of the first shot." *Mitzel*, 1989 WL 110827, at *8. According to the evidence presented at trial, Mitzel admitted that Ralston was still alive before Mitzel fired the second shot. In addition, "the weapon, a .22 caliber Ithaca rifle, was a single-shot gun which required [Mitzel] to open the chamber to eject the spent casing, reinsert another shell, close the chamber, cock the hammer, aim at the decedent, and pull the trigger." *Id*. The

omitted). We **AFFIRM** the district court's denial of Mitzel's habeas petition with respect to this issue.

**C.  Was Mitzel's Constitutional Right to a Fair Trial Violated When the State Trial Court Failed to Instruct the Jury on the Defense of Aiding and Abetting a Suicide?**

Mitzel argues that, because aiding and abetting a suicide is not a crime in Ohio, *State v. Sage*, 510 N.E.2d 343, 346-47 (Ohio 1987), and because his conduct was aimed solely at aiding and abetting Ralston's suicide, the trial judge should have issued an instruction that would have allowed the jury to find that Mitzel's actions constituted only aiding and abetting a suicide.  As we have noted, "[t]o warrant habeas relief because of incorrect jury instructions, Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000). Allegations of "trial error" raised in challenges to jury instructions are also reviewed under *Brecht*'s harmless error standard. *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir.), *cert. denied*, 121 S. Ct. 588 (2000).

In this case, Mitzel claims the state trial court erred in failing to include an instruction on aiding and abetting suicide, an instruction that Mitzel never requested at trial.  In *Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977), the Supreme Court discussed the difficulty of gaining habeas relief based on such a claim:

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.
>
> *In this case, the respondent's burden is especially heavy because no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.*

firearm specification, and term of fifteen years to life for the murder conviction.

On direct appeal to the Ohio Court of Appeals, Mitzel raised a number of claims (including the claims on which a certificate of appealability was granted for habeas corpus review in this court), all of which were unsuccessful. *State v. Mitzel*, No. 3917, 1989 WL 110827 (Ohio Ct. App. Sept. 22, 1989). Petitioner's motion for leave to appeal to the Supreme Court of Ohio was "dismissed sua sponte for the reason that no substantial constitutional question exists therein." Joint Appendix ("J.A.") at 245 (Order Dis. App.).

On October 25, 1996, Mitzel filed a petition for habeas corpus relief in the United States District Court for the Northern District of Ohio.  The habeas petition was then assigned to a United States Magistrate Judge who, on February 10, 1999, issued a report recommending that Mitzel's habeas petition be denied in its entirety.  On July 9, 1999, the district court adopted the magistrate judge's report and recommendation in its entirety, and denied Mitzel's habeas petition. Furthermore, "the Court certifie[d], pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there [was] no basis upon which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)." J.A. at 746 (Dist. Ct. Order. Den. Habeas Relief).

Following the district court's denial of his habeas petition, Mitzel then sought a certificate of appealability from this court.  We granted Mitzel's motion for a COA on the following three issues:

1)  whether the trial court improperly admitted into evidence statements made by Mitzel to police;

2)  whether the trial court improperly failed to give a jury instruction on aiding and abetting a suicide; and

3) whether his trial counsel rendered ineffective assistance by not requesting a jury instruction on aiding and abetting suicide.

We limit our review to these questions.

## II. ANALYSIS

### A. Standard of Review

We review de novo the legal conclusions made by the district court in its disposition of a habeas corpus petition pursuant to 28 U.S.C. § 2254. *Palazzolo v. Gorcyca*, 244 F.3d 512, 515 (6th Cir. 2001). Because this habeas petition was filed after April 24, 1996, it will be governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to AEDPA, habeas corpus relief is unavailable with respect to any claim adjudicated on the merits in state court unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In addition, for purposes of habeas corpus review of state court decisions, findings of facts made by a state court are presumed to be correct and can only be contravened if the habeas petitioner can show, by clear and convincing evidence, that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). This presumption of correctness applies even to factual findings made by a state court of appeals based on the state trial record. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court interpreted the language of § 2254(d)(1), stating that a

To convict someone of murder, the state must prove that the defendant purposely caused the death of another. The trial judge explained in his instructions to the jury that, under Ohio law, "[i]f a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon." Tr. at 333 (Jury Instructions). Furthermore, an act can be said to "cause" death when "in the natural and continuous sequence [it] directly produces the death and without which [death] would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act." Tr. at 335 (Jury Instructions).

In this case, the jury could easily infer Mitzel's purpose to cause Ralston's death by his decision to shoot a .22-caliber rifle at Ralston's head at close range. As for causation, the pathologist testified that *both* bullet wounds were the cause of Ralston's death. Tr. at 165 (Adelman Direct Exam.). The pathologist refused to conclude that death would have occurred had only the first shot been fired, stating only that it was "possible." Tr. at 176 (Adelman Cross-Exam.). In addition, there is no question that death is the natural and foreseeable result of shooting someone in the head at close range, and Mitzel openly admitted on the witness stand to shooting Ralston while Ralston was still alive, conscious, and coherent enough to speak with Mitzel. Tr. at 240-41 (Mitzel Cross-Exam.).

Given Mitzel's clear admission that he, alone, inflicted the second shot to Ralston's head at close range while Ralston was still clearly alive, and the pathologist's testimony that both bullet wounds caused Ralston's death, we simply cannot conclude that the admission of Mitzel's post-polygraph statement substantially affected or influenced the jury's verdict finding Mitzel guilty of the lesser included offense of murder. Based on this evidence, we do not believe that the admission of Mitzel's post-polygraph statement had "a harmful or injurious effect on the fundamental fairness of the trial." *Gilliam*, 179 F.3d at 995 (internal quotation marks

inflicting the *second* shot, we are confident that the post-polygraph statement did not substantially affect or influence the jury's decision to convict Mitzel of the lesser included offense of murder.

The pathologist who testified at trial stated that both bullet wounds, along "with the hemorrhages that were associated with them[,]" constituted the main cause of death. Tr. at 165 (Adelman Direct Exam.). The state court of appeals also noted this testimony, stating that "[t]he cause of death was the result of both wounds." *Mitzel*, 1989 WL 110827, at *9. The pathologist could not state, however, whether death would have occurred had not both shots been fired. Tr. at 175-76 (Adelman). The pathologist, after later testifying that the first bullet wound, in conjunction with the hemorrhaging and asphyxiation associated therewith, was the main cause of death, was asked whether the first wound (the wound solely inflicted by Ralston, viewing the facts in the light most favorable to Mitzel) could have caused death without the second wound (the wound Mitzel admitted that he, alone, inflicted). In response, the pathologist could only state that it was "possible." Tr. at 176 (Adelman Cross-Exam.).

As the state trial judge instructed the jury before its deliberations, for the State to prove that Mitzel committed aggravated murder, it must prove that Mitzel "purposely caus[ed] the death of another with prior calculation and design." Tr. at 330 (Jury Instructions). To prove the lesser offense of murder, the State need not show premeditation, and need only prove that Mitzel "purposely caused the death of" Ralston. Tr. at 331-32 (Jury Instructions). The jury in Mitzel's case did not return a verdict finding prior calculation and design on the part of Mitzel but instead found Mitzel guilty of the lesser offense of murder. In light of the evidence presented at trial with respect to Mitzel's independent firing of the second shot, we do not believe that there is anything more than a possibility that the admission of Mitzel's post-polygraph statement with respect to the first shot contributed to the jury's decision to find him guilty of the lesser included offense of murder.

distinction must be made between what is "contrary to" and an "unreasonable application of" clearly established Supreme Court precedent, for both provisions have independent meaning. The Court held that for a state court's decision to be "contrary to" clearly established Supreme Court precedent, it must "arrive[] at a conclusion opposite to that reached by this Court on a question of law[,]" or it must face a set of "facts that are materially indistinguishable from a relevant Supreme Court precedent and" still arrive at an opposite result. *Id*. at 405. A state court decision constitutes an "unreasonable application of" Supreme Court precedent, however, when the state court correctly identifies the governing legal principle in the case, yet it unreasonably applies that principle to the facts of the defendant's case. *Id*. at 407-09. Following *Williams*, we may not overturn a state court's decision simply because we believe that the state court applied Supreme Court precedent incorrectly. *Id*. at 411. Instead, the state court's application of Supreme Court precedent must also be objectively unreasonable. *Id*.

It is important to stress that we may only look to the holdings of the Supreme Court, and not its dicta, in deciding whether a state court's decision is "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent. *Id*. at 412. In addition, we are limited to an examination of the Supreme Court's holdings as they existed at the time of the relevant state court decision. *Id*. We may not look to the decisions of our circuit, or other courts of appeals, when "deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law." *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

## B.  Was Mitzel's Sixth Amendment Right to Counsel Violated?

We granted a COA with respect to the question whether the state trial court improperly admitted into evidence the statements made by Mitzel to the police. Mitzel focuses his argument under this heading on one issue: whether the police

violated his Sixth Amendment right to counsel by telling him the results of his polygraph examination and then taking a statement from him immediately thereafter without Mitzel's attorney being present.

On the evening of January 12, 1987, the night Mitzel first spoke to the police about the circumstances surrounding Ralston's death, the police asked Mitzel if he would be willing to take a polygraph test. The next morning, following Mitzel's initial appearance in state court, where he was represented by counsel, police obtained permission from Mitzel's lawyer to administer a polygraph test without Mitzel's attorney being present.    After the test was administered, the officers who transported Mitzel to the testing location were informed that there were "discrepancies" in Mitzel's test results. Supp. Hr'g at 63 (Officer Tedesco Direct Exam.). The officers then transported Mitzel back to the Niles Police Department, took him into Officer Tedesco's office, and informed him that the test results showed "that he was not telling . . . the whole truth." *Id*. It was at this point, according to Officer Tedesco, that Mitzel then stated that he wanted to tell them "the whole truth." *Id*. At trial, Tedesco testified that he both informed Mitzel of his right to have counsel present for any statement given to the police and offered to call Mitzel's lawyer to have him present for the interview. Tedesco testified that Mitzel declined to have his lawyer present. Tedesco then advised Mitzel of his rights and had him sign a rights waiver form. The interview was tape recorded.

Each of Mitzel's statements to the police on January 12 and 13, 1987 varied factually, and it was in this post-polygraph interview with the police that Mitzel made arguably his most damaging confession. Whereas Mitzel originally told police that Ralston took the gun from Mitzel and that Ralston alone inflicted the first shot, in Mitzel's post-polygraph statement, he explained that Ralston was unable to pull the trigger himself, and had asked Mitzel for help. According to this statement, Ralston asked Mitzel to help pull Ralston's thumb,

*Satterwhite v. Texas*, 486 U.S. 249, 257 (1988).  In applying the harmless error analysis on habeas review for cases governed by AEDPA, we apply the harmless error standard set out in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), even when the "federal habeas court is the first to review for harmless error." *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999), *cert. denied*, 528 U.S. 1120 (2000).

Under the *Brecht* standard, a habeas petitioner must establish that the trial "error had substantial and injurious effect or influence in determining the jury's verdict[.]" *Brecht*, 507 U.S. at 637 (quotation omitted).  To meet this standard, there must be more than a "'reasonable possibility'" that the error contributed to the jury's verdict.  *Id*. at 637 (quotation omitted).  If, however, there is a "reasonable *probability*" that a trial error affected or influenced the verdict, then the *Brecht* standard would be satisfied. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  Ultimately, as we have stated before, we must ask whether the error had "a harmful or injurious effect on the fundamental fairness of the trial." *Gilliam*, 179 F.3d at 995 (internal quotation marks omitted).

In this case, assuming a Sixth Amendment violation did occur, habeas relief will not be available unless there is more than a reasonable possibility that the admission of Mitzel's post-polygraph confession contributed to the jury's guilty verdict.  After a review of the trial record, we agree with both the magistrate judge and the district court that any constitutional violation that occurred was harmless.

Mitzel argues that his post-polygraph statement indicating that he assisted Ralston in inflicting the first gunshot wound was critical evidence to the State's case.  Indeed, it is clear from a review of the trial record that the State, in pursuing an aggravated murder conviction, wanted to present evidence showing that Mitzel played a role in inflicting the first shot. It is important to emphasize, however, that while the post-polygraph statement was the most damaging of Mitzel's statements regarding his role in the *first* shot that was fired at Ralston, in light of the evidence regarding Mitzel's role in

attorney being present. Thus, it is clear both that Mitzel's Sixth Amendment right to counsel had attached by the time the police administered the polygraph examination, and that the police interviewed Mitzel after the polygraph without Mitzel's lawyer being present. The key question, then, as the magistrate judge noted, is whether it was the police or Mitzel who initiated this post-polygraph conversation. As noted earlier, if we were to conclude that the police initiated Mitzel's post-polygraph statement, then Mitzel's waiver of his right to counsel following the initiation of interrogation would be invalid, and the admission of this statement at trial would violate the defendant's Sixth Amendment rights.

The magistrate judge determined that it was the police, and not Mitzel, who initiated the post-polygraph interrogation. The magistrate judge was heavily influenced by the fact that Mitzel's attorney, as the police admitted, had not given them permission to question Mitzel after the polygraph examination concluded, and that, following the polygraph, rather than returning Mitzel to his cell, the officers took him to an office, at which point they informed him of the test results.

We assume, without deciding, that the police officers' conduct in initiating the polygraph examination, failing to get Mitzel's attorney's permission to speak with Mitzel about the results of the examination, and then taking Mitzel to Officer Tedesco's office after the exam to inform him that the test showed that he had not been truthful, constituted a deliberate attempt by the police to elicit information from Mitzel without Mitzel's attorney being present in violation of Mitzel's Sixth Amendment right to counsel. We need not decide this issue, however, for, like the magistrate judge and the district court before us, we do not believe that Mitzel has met his burden of showing that any constitutional error resulting from the admission of his post-polygraph statement was not harmless.

In "cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial[,]" harmless error analysis applies.

which was on the trigger. Mitzel complied, and as he began to pull at Ralston's thumb, the rifle discharged.

On appeal to this court of the denial of his petition for a writ of habeas corpus, Mitzel contends that this post-polygraph statement, given without his lawyer present, violated his Sixth Amendment right to counsel. The state court of appeals focused its analysis on the admissibility of other confessions Mitzel gave to the police, and did not address this specific issue, despite the fact that the issue was briefed for the state court of appeals. Upon review of Mitzel's habeas petition, both the magistrate judge and the district court agreed that, in taking this statement without Mitzel's lawyer present, the police violated Mitzel's Sixth Amendment right to counsel. In reaching this determination, both the magistrate judge and the district court concluded that the Sixth Amendment right to counsel had attached by the time the police had administered the polygraph test, and that the key issue in determining whether Mitzel's Sixth Amendment right to counsel was violated was whether the police could be viewed as having initiated interrogation based on their conduct following Mitzel's polygraph exam. Both the magistrate judge and the district court concluded that the officers' conduct in taking Mitzel back to Officer Tedesco's office after the polygraph examination to inform him of the test results constituted an initiation of interrogation without Mitzel's lawyer being present, in violation of the Sixth Amendment.

Despite the finding of constitutional error, both judges agreed that, on habeas review, they could not overturn a conviction based on constitutional error if they believed that error to be harmless. Both judges then examined the evidence presented at trial and held that, in light of the totality of the circumstances, the constitutional error in admitting Mitzel's post-polygraph confession was harmless.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend.

VI. The purpose of the Sixth Amendment, as the Supreme Court has described it, "is to assure that in any criminal prosecution the accused shall not be left to his own devices in facing the prosecutorial forces of organized society." *Moran v. Burbine*, 475 U.S. 412, 430 (1986) (quotations omitted). The Sixth Amendment right to counsel attaches only after "adversary judicial proceedings" have been initiated against the defendant, "'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)). Once the Sixth Amendment right attaches, any governmental attempt to elicit information from the accused without the defendant's lawyer present, even through means that may be permissible under the Fifth Amendment right to counsel prior to the point at which the Sixth Amendment right to counsel attaches (*e.g.*, electronic monitoring of a suspect's conversations with others), is prohibited. *Michigan v. Jackson*, 475 U.S. 625, 632 (1986).

In this case, implicit in both the State's and Mitzel's arguments is the notion that Mitzel's Sixth Amendment right to counsel had attached by the time the police administered the polygraph examination and thereafter took Mitzel's final statement. It is clear from the facts of the case as well as the Ohio Rules of Criminal Procedure that, by the time Mitzel's polygraph test had been administered, he had been placed under arrest, the police had issued a complaint against him detailing the essential facts of the offense with which he was charged, and he had appeared before a state judge. Ohio R. Crim. P. 3, 4(E)(2), 5(A). It is also clear from the facts of the case that, following Mitzel's initial appearance in front of the state judge, the court ordered that his confinement in jail continue. As the Supreme Court stated in *Brewer v. Williams*, 430 U.S. 387, 399 (1977), "[t]here can be no doubt . . . that judicial proceedings had been initiated against [the defendant when] . . . [a] warrant had been issued for his arrest, he had been arraigned on that warrant before a judge . . ., and he had been committed by the court to confinement in jail." In light of the similar proceedings initiated against Mitzel prior to his

post-polygraph statement to the police, we follow *Brewer* in holding that Mitzel's Sixth Amendment right to counsel had attached by the time the statement at issue was given.

One of the key Sixth Amendment cases examined by the magistrate judge and the district court in determining that Mitzel's right to counsel had been violated was *Michigan v. Jackson*, 475 U.S. 625 (1986). In *Jackson*, the Supreme Court applied principles first enunciated as part of a suspect's Fifth Amendment right to counsel to the Sixth Amendment setting. The defendants in *Jackson*, after adversary proceedings had been initiated against them and they had requested the representation of counsel, were interrogated by police regarding the crimes with which they had been charged. Before questioning the defendants, the police read them their *Miranda* rights. Nevertheless, the defendants agreed to be questioned by the police without a lawyer present. The statements made by the defendants to the police were later admitted at trial over the defendants' objections, and the defendants were both convicted.

The Supreme Court, based on these facts, held that the defendants' Sixth Amendment right to counsel had been violated. Extending its holding in *Edwards v. Arizona*, 451 U.S. 477 (1981), to the Sixth Amendment context, the Court held that, once a defendant's Sixth Amendment right attaches and he has asserted his right to counsel, the police may *not* initiate any interrogation of the defendant from that point forward, and "any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Jackson*, 475 U.S. at 636.

Applying *Jackson* to this case, it is clear that by the time Mitzel's Sixth Amendment right to counsel had attached, Mitzel's father had arranged for him to be represented by counsel. The State does not contest that this attorney represented Mitzel by the time of his initial appearance. It is also undisputed that, following the initial appearance, the police received permission from Mitzel's attorney to administer a polygraph test to the defendant without the