NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0972n.06

No. 11-3191

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Sep 04, 2012*

DEBORAH S. HUNT, Clerk

MICHAEL A. HORTON,                                          )
                                                           )
    Petitioner-Appellee,                                   )
                                                           )
v.                                                         )  ON APPEAL FROM THE UNITED
                                                           )  STATES DISTRICT COURT FOR THE
WARDEN, TRUMBULL CORRECTIONAL                              )  NORTHERN DISTRICT OF OHIO
INSTITUTION,                                               )
                                                           )
    Respondent-Appellant.                                  )
                                                           )

BEFORE:  COLE, GILMAN, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  Respondent-Appellant Warden of the Trumbull

Correctional Institution appeals the district court's order conditionally granting Petitioner-Appellee

Michael Horton's petition for a writ of habeas corpus based on the Ohio state trial court's refusal to

issue a self-defense instruction in Horton's 2007 trial for murder, in violation of Ohio Rev. Code §

2903.02(A), and for discharging a firearm while in a motor vehicle, in violation of Ohio Rev. Code

§ 2923.16(A).  Because we conclude that the state court adjudication of Horton's due process claim

did not involve an unreasonable application of clearly established federal law, we **REVERSE**.

**I.**

The Ohio Court of Appeals summarized the facts of the case as follows:

¶2 On August 11, 2006, 18-year-old April Kienzle was celebrating her birthday.  A
party for Kienzle and her friend, Amanda, was planned at a house on 15th Street in
the City of Canton occupied by Amanda's brother.  Kienzle arrived at the party about

2:30 p.m. to help set up. There was a mix of people at the party - "older folk, younger folks, middle-age folks." Among the partygoers were the Delgado brothers, James and Jesse, Perry Carlisle, Coty Cricks and Ricky Joiner.

¶3 Later that day, [Horton] called Kienzle on her cell phone and asked her to come meet him. Kienzle dated [Horton] for about a year before the party. Kienzle told [Horton] she could not meet him because she was at the party drinking beer and doing shots. [Horton] then told Kienzle he wanted to see her. Kienzle checked with Amanda, Joiner, the Delgado Brothers and others, asking them if they had a "problem if Mike came over?" Kienzle then told [Horton] he could come over, that "nothing was going to happen" and gave him directions to the party.

¶4 [Horton] asked his friend, Mario Carbenia, if he would drive him to the party offering him $ 10.00 for gas. Carbenia had use of his cousin's green Ford Explorer that day and agreed to take [Horton] to the party. [Horton] took a .40 caliber semi-automatic handgun with him to the party, tucked in his pants at the belt line. On the way over to the party, Carbenia and [Horton] were lost and called Kienzle for additional directions. By the time the pair arrived at the party it was dark. Carbenia pulled the Explorer over to the south side of the road across from the party house. Carbenia left the Explorer's motor running. There were 10 to 14 people on the porch. [Horton] called Kienzle on his cell phone and told her he was outside. Kienzle came out of the house with two other girls and went to the passenger side of the Explorer next to the curb to talk to [Horton]. [Horton] remained in the car and the couple exchanged greetings. Kienzle saw the handgun tucked in [Horton's] pants and told him "if he was going to start anything, he could go ahead and leave because we weren't having that." One of the girls standing by the Explorer with Kienzle left and went back into the home.

¶5 While Kienzle and [Horton] were talking, Coty Cricks came up to the driver's side window, looked in and walked over to Kienzle, saying "[I]s this who I'm supposed to be holding Ricky back from?" Hearing this, Carbenia tapped [Horton] on the chest saying, "something's wrong, let's go." [Horton] and Carbenia did not leave.

¶6 Joiner, Jesse Delgado and Perry Carlisle went out to the Explorer. Joiner ran up to the passenger side window and reached inside the vehicle. Kienzle heard some yelling and then a gunshot. Joiner fell to the ground and the Explorer pulled off.

¶7 After the shooting, there was a lot of screaming and panic - "millions of people running around and screaming. Kienzle and her girlfriend left in a car and went to the home of Carol Kemp. They were hysterical, screaming and saying, "we just saw somebody get shot in the head." Kemp called 911. A detective called her back and

asked her to send the girls down to the police station to make a statement. Kemp overheard Kienzle talking on her cell phone saying, "It was my fault because I got him there."

¶8 The Delgado brothers, Cricks and Carlisle went to the aid of Joiner. They were holding Joiner who had been shot in the left cheek. Cody Cricks put a shirt over Joiner's face and put pressure on the gunshot wound. The paramedics were dispatched at 11:32 pm. They found Joiner lying on the ground with a gunshot would [sic] to his head under his left eye. About 15 minutes later, they arrived at Aultman Hospital. Joiner was pronounced dead of a gunshot wound in the emergency room of the hospital.

¶9 After [Horton] shot Joiner, Carbenia "took off" in the Explorer. When they got down the street, Carbenia testified that there was a clear beer bottle on [Horton's] lap. [Horton] threw the bottle out the window. Carbenia asked [Horton] what happened to the expelled bullet jacket and [Horton] told him it was still in the gun. [Horton] took off his shirt and directed Carbenia to the home of his girlfriend in East Canton, Anna Rukavina. [Horton] and Carbenia arrived around midnight. [Horton] took Rukavina in the bedroom and told her that he thought he killed someone. [Horton] told her that the truck he was riding in was surrounded by fifteen people and that he shot out the window to back everyone away from the truck. He was wearing a grill on his front teeth and complained that it felt different. [Horton] told Rukavina that he had been hit in the mouth with a beer bottle.

¶10 [Horton] stayed the night with Rukavina. The next morning about 5:30 a.m., Rukavina received a call from Joiner's cousin who told her that [Horton] had killed Joiner. Rukavina later received calls that there were people out looking for [Horton]. Rukavina told [Horton] about the telephone calls.

¶11 A day after the shooting, [Horton], accompanied by his mother, turned himself in to authorities at the Stark County Sheriffs Department.

¶12 Detective Vic George of the Canton Police Department was assigned to investigate the shooting of Joiner. George interviewed witnesses and learned the name of a suspect, Michael Horton, Jr. Detective George learned that [Horton] had turned himself in and went out to the Stark County Jail to interview him. Detective George observed no injuries on [Horton] and [Horton] complained of none. [Horton] told Detective George it [the shooting] wasn't his fault — that it was an accident. [Horton] further told Detective George that Joiner struck him in the face with a clear colored beer bottle. When that happened, he pulled a gun out of the waistband of his pants with his left hand and drew his arms across his chest to fire it out the window

to scare off the person. Detective George asked [Horton] about the gun. [Horton] responded that it was in a safe place.

¶13 Detective George was unable to locate the beer bottle where [Horton] said he threw it. The gun was not found.

¶14 The Chief Deputy Coroner, P. S. Murthy, performed an autopsy on Joiner's body. Doctor Murthy noted that Joiner was an 18-year-old "very healthy young man." Doctor Murthy first observed a lot of blood and a gunshot wound in the region of the left face. He saw a grazing wound on the left side of the nostril. Doctor Murthy also observed a prominent area of stippling on the face. Doctor Murthy described stippling as "when a firearm is discharged, burnt powder and then unburnt power is discharged from the firearm; and this unburnt gunpowder particles make small punctate reddish brown marks on the body and the skin surface." There were also areas of stippling on Joiner's right forearm. The presence of stippling can indicate how far the muzzle of the gun was from the skin surface. From the presence of the stippling, Doctor Murthy was able to opine that the gun was fired 1-1/2 to 3 feet from Joiner's face and cheek. Doctor Murthy also opined that the stippling on Joiner's right forearm was caused when Joiner attempted to deflect the gun.

¶15 Based on his examination of the brain, Doctor Murthy was able to determine that the bullet traveled through Joiner's skull essentially pulverizing it — pulpefaction. The brain was torn into small pieces and became a soupy type of material. Joiner died from hemorrhaging of the brain caused by a gunshot wound to the face.

¶16 Doctor Murthy was able to collect some bullet fragments from the brain; the lead core of the bullet, two large fragments and the copper jacket. Those fragments were turned over to the Stark County Crime Laboratory for analysis.

¶17 Dennis Florea, firearms expert, examined the bullet fragments and copper jacket. From that examination, Florea was able to determine that the bullet was fired from a firearm having six lands and grooves with a right twist. Glock Firearms, Heckler & Koch Firearms, Israeli Military Industries or IMI, and Kahr Firearms produce such a firearm. Florea examined the coroner's pictures of Joiner's body and noted the stippling on his face. Florea opined that the muzzle of the firearm was held 12 to 18 inches from Joiner's cheek when it was fired.

*State v. Horton*, No. 2007-CA-00085, 2007 WL 4237098, at *1–3 (Ohio Ct. App. Dec. 3, 2007)

(unpublished opinion).

In October 2006, the prosecuting attorney for Stark County, Ohio, charged Horton with murder, Ohio Rev. Code § 2903.02(A), discharging a firearm while in a motor vehicle, *id*. § 2923.16(A), and having a weapon while under a disability, *id*. § 2923.13(A)(3). Before trial, Horton pleaded guilty to having a weapon while under a disability. In February 2007, the two remaining charges proceeded to a jury trial. Following the presentation of evidence, Horton requested a jury instruction on self-defense, but the court found that there was insufficient evidence to support a self-defense instruction. Horton also requested instructions on negligent homicide, reckless homicide, voluntary manslaughter, involuntary manslaughter, and aggravated assault, all of which the court denied. The trial court instructed the jury, in relevant part:

> Before you can find the Defendant guilty, you must find that beyond a reasonable doubt that on or about the eleventh day of August, 2006, in Stark County, Ohio, Michael Anthony Horton, Jr., purposefully caused the death of [Joiner].
> . . . .
> Purposely. Purpose to cause death is an essential element of the crime of murder. A person acts purposely when it is his specific intention to cause a certain result.
>
> It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of [Joiner].
>
> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in a specific conduct. To do an act purposely is it [sic] do it intentionally and not accidentally. Purpose and intent mean the same thing.
>
> The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.
>
> The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapons used, and all the other factors and circumstances in evidence.

> If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon.
>
> Proof of motive is not required. The presence or absence of motive is one of the circumstances bearing upon purpose.

(Tr., R. 11-3, at 880–83.)

The jury convicted Horton of both counts, and on February 26, 2007, the court sentenced Horton to an aggregate term of 25 years to life in prison.

On direct appeal, Horton claimed, *inter alia*, that the trial court erred by refusing to instruct the jury on self-defense. The Ohio Court of Appeals affirmed Horton's conviction and found that the trial court did not abuse its discretion by refusing the instruction. *See Horton*, 2007 WL 4237098, at \*14–15. The court concluded:

> ¶111 In the case at bar, [Horton] simply did not present sufficient evidence in this case that would enable a juror to reasonably believe that [Horton] had a bona fide belief that he was in imminent danger of death or great bodily harm from either the decedent or anyone else, or that any of the individuals at the party were involved in any common scheme or plan to rob and assault [Horton], that warranted [Horton's] use of deadly force to defend himself against the decedent. In fact, such an argument runs counter to [Horton's] statement to the police that the shooting was accidental. Finally, [Horton] was seated inside a motor vehicle parked on the street with the motor running. There is no evidence to suggest that [Horton] was impeded from simply driving away from the party.

*Id.* at \*15.

On appeal to the Supreme Court of Ohio, Horton claimed, *inter alia*, that the trial court's refusal to instruct the jury on self-defense deprived him of due process. The Supreme Court of Ohio dismissed Horton's appeal as not involving a substantial constitutional issue.

Horton then timely filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Ohio. The Warden responded that Horton's habeas claims were all procedurally barred except for the claims that he was deprived of due process because the trial court refused to give instructions on self-defense and on negligent homicide. Horton filed a traverse in which he abandoned all but one ground for relief—namely, that "the state appeals court unreasonably applied *California v. Trombetta*, 467 U.S. 479 (1984)[,] when it held that Mr. Horton failed to present sufficient evidence to support a self-defense instruction." (Traverse, R. 9, at 5.)

A magistrate judge issued a Report and Recommendation ("R&R") concluding that Horton's petition should be granted unless the state of Ohio afforded him a new trial. The district court incorporated in full the magistrate's R&R and conditionally granted Horton's petition for a writ of habeas corpus. (Op. & Order, R. 13, at 10.) The Warden timely appealed.

**II.**

The Warden first contends that in granting Horton's habeas petition, the district court "erroneously transformed what should have been a non-cognizable State law challenge in habeas to a reviewable question of the denial of the federal due process right to present a defense." (Warden Br. at 18.) We disagree.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citations omitted). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id*. at 67–68. Here, Horton's habeas petition raises

a federal constitutional question arising from a state-court determination. The magistrate judge correctly stated that Horton's habeas issue is whether "an error of state law has resulted in a denial of a federal constitutional right"—specifically, the due process right to present a complete defense. (R&R, R. 10, at 11.) Horton thus raised a cognizable habeas issue. *See Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007) (finding cognizable on habeas review a claim that the admission of "other acts" evidence as a matter of state evidentiary law was so prejudicial that it violated due process); *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002) (holding that "failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause").

## III.

The second question before this Court is whether the Ohio Court of Appeals' decision involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).[1] The Warden argues that Horton cannot succeed on his habeas claim because he has failed to demonstrate either that a criminal defendant has a clearly established due process right to a jury

---

[1] Horton first alleged a violation of due process and *Trombetta* on direct appeal to the Ohio Supreme Court, and not to the Ohio Court of Appeals, where he merely claimed plain error. However, the Ohio Supreme Court dismissed Horton's appeal as "not involving a substantial constitutional question" in a one-sentence order. Accordingly, although for § 2254(d) purposes the relevant state-court adjudication on the merits of the claim is the Ohio Supreme Court order, we will treat that order as incorporating the reasoning used by the Ohio Court of Appeals in finding no abuse of discretion by the trial court, and determine whether that reasoning, or any other arguments or theories, could have supported the Supreme Court's dismissal of his constitutional claim. *See Harrington v. Richter*, --- U.S.---, 131 S.Ct. 770, 784, 786 (2011) (holding that where a state court decision is unaccompanied by an explanation, the habeas petitioner must nevertheless show there was no reasonable basis on which the state court could have denied relief).

instruction on self-defense, or that, even assuming such a right exists under clearly established law, the Ohio Court of Appeals' adjudication of that claim involved an unreasonable application of such law.

This Court reviews *de novo* the district court's decision to grant or deny a habeas corpus petition. *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). "When the district court relies on a transcript from the petitioner's state trial and makes no independent determinations of fact, we review the district court's factual findings *de novo*, as well." *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003) (citation omitted).

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "this Court reviews deferentially state court decisions affirming the conviction of a habeas petitioner." *Maldonado v. Wilson*, 416 F.3d 470, 474 (6th Cir. 2005). We presume state-court factual findings, including those "made by a state court of appeals based on the state trial record," to be correct, unless the habeas petitioner is able to rebut that presumption by clear and convincing evidence. *Mitzel*, 267 F.3d at 530 (citation omitted). Habeas corpus relief is unavailable with respect to any claim adjudicated on the merits in state court unless the state-court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Clearly established federal law refers only to the decisions of the Supreme Court, not those of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). However,

AEDPA does not require the Supreme Court to have decided the precise case for clearly established law to exist. *Taylor*, 288 F.3d at 850. Clearly established federal law "includes legal principles and standards enunciated in the [Supreme] Court's decisions[,]" rather than just "bright-line rules laid down by the Court." *Id*.

A state-court decision unreasonably applies clearly established federal law "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. In addition, "a state-court decision involves an unreasonable application of [Supreme Court] precedent if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*.

"The unreasonable application clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citation and internal quotations omitted). "The state court's application of clearly established law must be objectively unreasonable." *Id*. (citation omitted). Although AEDPA does not completely bar "federal court relitigation of claims already rejected in state proceedings[,]" habeas relief is only a "guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal." *Harrington*, 131 S.Ct. at 786 (citations and internal quotation marks omitted). "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of th[e Supreme] Court." *Wogenstahl v. Mitchell*, 668 F.3d 307, 327 (6th Cir. 2012) (quoting *Harrington*, 131 S.Ct. at 786).

## A. Clearly Established Federal Law

The due process clause of the Fourteenth Amendment affords criminal defendants "a meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 485. Further, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citing *Stevenson v. United States*, 162 U.S. 313 (1896)). In *Taylor v. Withrow*, 288 F.3d at 851–52, this Court reasoned that a "necessary corollary" of the principle set forth in *Trombetta* is the rule that a criminal defendant has a due process right to a jury instruction on self-defense. *See id.* ("We hold that ... failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause.").[2]

---

[2] In *Taylor*, we ultimately reversed the district court's grant of habeas upon finding that the state-court's determination that insufficient evidence existed to warrant a jury instruction on self-defense did not involve an unreasonable application of clearly established federal law. 288 F.3d at 854. Based on that reversal, this Court later described as dicta the purported holding in *Taylor* that failure to instruct a jury on self-defense when the instruction is requested and supported by sufficient evidence violates the due process clause. *Newton v. Million*, 349 F.3d 873, 878–79 (6th Cir. 2003). *Newton* ultimately distinguished *Taylor* on the basis that "Newton's claim does not rest on the court's denial of a self-defense instruction. Rather, he challenges the specific content of the instruction," namely that the trial court did not instruct the jury concerning multiple aggressors. *Id.* at 879. Without disturbing the holding in *Taylor*, we concluded that the Supreme Court had not clearly established a right to a *specific* jury instruction. *Id.*

Although there is "no Supreme Court decision unmistakably setting down this precise rule," we noted in *Taylor* that "relevant [Supreme Court] precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Id.* at 852 (citing *Williams*, 528 U.S. at 407). If a trial court could refuse to instruct the jury on a criminal defendant's theory of defense sufficiently supported by the evidence, the right to present a defense would be meaningless. *Id.*

### B. Sufficiency of Evidence Under Ohio Law

We now turn to whether the Ohio Court of Appeals unreasonably applied clearly established federal law when it determined that Horton's due process rights were not violated by the trial court's refusal to instruct the jury on self-defense. "When assessing whether a state court's application of federal law is unreasonable, 'the range of reasonable judgment can depend in part on the nature of the relevant rule' that the state court must apply." *Renico v. Lett*, 130 S.Ct. 1855, 1864 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A federal habeas court must consider the specificity of the rule that the state court applied. *Yarborough*, 541 U.S. at 664. "The more general the rule, the more leeway courts have in reaching outcomes in case-by case determinations." *Id.*

Here, the trial court's determination whether Horton presented sufficient evidence to warrant a jury instruction on self-defense involved a "substantial element of judgment." *Id.* To properly raise self-defense under Ohio law, a defendant has the burden of producing sufficient evidence for each of the following: "(1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily

harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger." *State v. Melchior*, 381 N.E.2d 195, 199 (Ohio 1978) (citations omitted). Evidence is sufficient when, viewed in a light most favorable to the defendant, and without considering the question of credibility, it raises the question of self-defense in the mind of a reasonable juror. *State v. Belanger*, 941 N.E.2d 1265, 1269 (Ohio Ct.App.2010). "If the evidence generates only a mere speculation or possible doubt [rather than reasonable doubt of guilt], such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *Melchior*, 381 N.E.2d at 199.

Here, there is evidence that, just before the gun was fired, Joiner ran up to the passenger side window and reached inside the vehicle to hit Horton with a beer bottle. There is no evidence, however, that Horton knew Joiner was swinging a beer bottle, or even holding a beer bottle, at the moment when Horton fired his gun.

Fairminded jurists could thus disagree as to whether the evidence is sufficient to raise the question in the mind of a reasonable juror whether Horton had a bona fide belief that he was in imminent danger of death or great bodily injury at the time he fired the gun, and that his only means of escape from that danger was the use of deadly force. Accordingly, the district court erred in finding that the state court adjudication of Horton's due process claim involved an unreasonable application of clearly established federal law. *See Harrington*, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)).

**IV.**

For the foregoing reasons, we **REVERSE** the judgment of the district court.